# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 | MDL No. 2179 |
| This filing relates to: *Cases in Pleading Bundle B1, and VoO Charter Dispute Cases* | Section: J |
| | Honorable Carl J. Barbier |
| | Magistrate Judge Shushan |
| *Bon Secour Fisheries, Inc., et al. v. BP Exploration and Production, Inc., et al.,*  Civil Action No. 12-970 | Date:          November 8, 2012  Time:          8:30 a.m.  Courtroom:   C268 |
| Objections to Economic and Property Damages Settlement Agreement,  Civil Action No. 10-7777 | |

**MEMORANDUM IN SUPPORT OF OBJECTIONS TO THE ECONOMIC AND PROPERTY DAMAGES SETTLEMENT AGREEMENT BY OBJECTORS HUNTER ARMOUR AND JUDITH ARMOUR**

## TABLE OF CONTENTS

TABLE OF CONTENTS ....................................................................................................... i

TABLE OF AUTHORITIES ........................................................................................... ii-v

Summary of Objection.......................................................................................................1

I.      The Court Must Protect Absent Class Members and Give Special Scrutiny
        to a Pre-Certification Settlement. ........................................................................4

II.     The Class Cannot Be Certified. ...........................................................................5

        A.      The Class Representatives Do Not Satisfy Rule 23(a)(4) .......................5

                1.      Intra-Class Conflicts Preclude Certification. .................................6

                2.      *In re Aqua Dots* Precludes Class Certification. .............................9

                3.      The Upside-Down Class Representative Selection Precludes Class
                        Certification. ...................................................................................10

        B.      A Class Action Is Not a Superior Means of Resolution When There
                Was Already an Existing Claims Process...........................................11

III.    The Settlement Is Unfair.....................................................................................18

        A.      *Bluetooth* Precludes Settlement Approval. ...........................................18

        B.      *Dennis v. Kellogg* Precludes Settlement Approval..............................29

IV.     The Settlement Violates Rule 23(h). ................................................................29

CONCLUSION.................................................................................................................31

PROOF OF SERVICE.....................................................................................................32

TABLE OF AUTHORITIES

*CASES:*

*Alfaro v. Commissioner*, 349 F.3d 225, 229 (5th Cir. 2003) ..........................................22

*Allison v. Citgo Petroleum Corp.*, 151 F.3d 402 (5th Cir. 1998) ...........................................12, 13

*Amchem Prods. v. Windsor*, 521 U.S. 591 (1997).................................................6, 11, 12, 15, 18

*Baroni v. Bellsouth Telcomms, Inc.*, 2004 U.S. Dist. LEXIS 14403, (E.D. La. 2004)..............13

*Beebe v. Pac. Realty Trust*, 99 F.R.D. 60 (D. Or. 1983) ................................................................11

*Berger v. Compaq  Computer Corp.*, 257 F.3d 475 (5th Cir. 2001).............................................6

*Bevrotte v. Caesars Ent. Corp.*, 2011 U.S. Dist. LEXIS 114463 (E.D. La. Oct. 4, 2011)............12

*Buckhannon Bd. & Care Home v. W. Va. Dep't of Health & Human Res.*,
     532 U.S. 598 (2001)...................................................................................................27

*Bublitz v. E.I. Dupont De Nemours & Co.*, 224 F. Supp. 2d 1234, 1239
     (S.D. Iowa 2002).......................................................................................................27

*Buettgen v. Harless*, 263 F.R.D. 378 (N.D. Tex. 2009) ...............................................................10

*Castano v. Am. Tobacco Co.*, 84 F.3d 734 (5th Cir. 1996) .........................................12, 13, 15, 17

*Charles v. Goodyear Tire & Rubber Co.*, 976 F. Supp. 321(D. N.J. 1997) .................................25

*Childs v. United Life Ins. Co.,* No. 10-CV-23-PJC, 2012 U.S. Dist. LEXIS 70113
     (N.D. Okla. May 21, 2012).......................................................................................23

*Corley v. Entergy Corp.*, 220 F.R.D. 478 (E.D. Tex. 2004)..........................................................12

*Create-A-Card Inc., v. Intuit, Inc.*, No. C 07-06452 WHA, 2009 WL 3073920,
     (N.D. Cal. Sept. 22, 2009) ........................................................................................25

*Daigle v. Ford Motor Co.*, 2012 U.S. Dist. LEXIS 106172 (D. Minn. July 31, 2012)..............15

*Dennis v. Kellogg*, No. 11-55674 (9th Cir. Jul. 13, 2012).....................................................20, 29

*Georgine v. Amchem Prods.*, 83 F.3d 610 (3d Cir. 1996) .................................................11, 12, 17

*Gregory v. Finova Capital Corp.*, 442 F.3d 188 (4th Cir. 2006) ..................................................16

*Ibarra v. Texas Employment Comm'n*, 823 F.2d 873 (5th Cir. 1987) ............................................4

*In re Aqua Dots Products Liability Litigation*, 654 F.3d 748
    (7th Cir. 2011) ....................................................................................2, 9, 10, 14, 18, 26

*In re Asbestos Litigation*, 134 F.3d 668 (5th Cir. 1999)..............................................................6

*In re Bluetooth Headset Products Liability Litigation.* 654 F.3d 935
    (9th Cir. 2011) ..............................................................3, 18-20, 22, 23-25, 28

*In re Cendant Corp. Prides Litig.*, 243 F.3d 722, (3d Cir. 2001)...................................................27

*In re Cmty. Bank of N. Va. & Guar. Nat'l Bank of Tallahassee Second*
    *Mortg. Litig.*, 418 F.3d 277 (3d Cir. 2005)...................................................21

*In re Elec. Data Sys. Corp. "ERISA" Litig.*, 2005 U.S. Dist. LEXIS 17457
    (E.D. Tex. Jun. 30, 2005)..........................................................................24

*In re Ford Motor Co. Bronco II Prods. Liab. Litig.*, 177 F.R.D. 360 (E.D. La. 1997) ................12

*In re GMC Dex-Cool Prods Liab. Litig.*, 2006 U.S. Dist. LEXIS 74503
    (S.D. Ill. Sept. 27, 2006)..........................................................................12

*In re GMC Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768 (3d Cir. 1995) ...............21

*In re Hotel Tel. Charges*, 500 F.2d 86 (9th Cir. 1974)...........................................................14, 18

*In re HP Inkjet Printer Litig.*, No. 5:05-cv-3580 JF, 2011 WL 1158635,
    10 (N.D. Cal. Mar. 29, 2011)..................................................................25

*In re Katrina Canal Breaches Litig. v. Bd. of Comm'rs*, 628 F.3d 185 (5th Cir. 2010) ......4, 18, 24

*In re Mercury Interactive Corp. Sec. Lit.*, 618 F.3d 988 (9th Cir. 2010) ...............................29, 30

*In re Monster Worldwide, Inc. Secs. Litig.*, 251 F.R.D. 132 (S.D.N.Y. July 14, 2008)................10

*In re Monumental Life Ins. Co.*, 365 F.3d 408 (5th Cir. 2004)....................................................12

*In re Prudential Ins. Co. America Sales Practices Litig.*, 148 F.3d 283 (3d Cir. 1998) .........25-27

*In re TD Ameritrade Accountholder Litig.*, 266 F.R.D. 418 (N.D. Cal. 2009) ............................25

*In re Vioxx Prods. Liab. Litig.*, 239 F.R.D. 450 (E.D. La. 2006) ................................................29

*In re Vitamins Antitrust Class Actions*, 215 F.3d 26 (D.C. Cir. 2000) ...........................................6

*Johnson v. Comerica*, 83 F.3d 241 (8th Cir. 1996) ........................................................21

*Langbecker v. Elec. Data Sys. Corp.*, 476 F.3d 299 (5th Cir. 2007)...............................7

*Madison v. Chalmette Ref., L.L.C.*, 637 F.3d 551 (5th Cir. 2011)..................................11

*New Orleans Depot Servs. v. Dir.*, ---F.3d---, 2012 U.S. App.
  LEXIS 15336, (5th Cir. July 25, 2012).....................................................................22

*Nguyen v. BMW of N. Am. LLC*, 2012 U.S. Dist. LEXIS 56018
  (N.D. Cal. Apr. 20, 2012) .......................................................................................27

*O'Keefe v. Mercedes-Benz USA, L.L.C.*, 214 F.R.D. 266, 304-05 (E.D. Pa. 2003) ................25

*Ortiz v. Fibreboard Corp.*, 527 U.S. 815 (1999)......................................................6, 18

*Pettway v. Am. Cast Iron Pipe Co.*, 576 F.2d 1157 (5th Cir. 1978)...............................18

*Puerto Rico v. M/V Emily S*, 158 F.R.D. 9 (D.P.R. 1994)............................................11

*Reed v. Gen. Motors, Corp.*, 703 F.2d 170, 172 (5th Cir. 1983)....................4, 18, 19, 30

*Robertson v. Monsanto Co.*, 287 Fed. Appx. 354 (5th Cir. 2008) (*per curiam*) ..................13, 17

*Robinson v. Tex. Auto. Dealers Ass'n*, 387 F.3d 416 (5th Cir. 2004) ............................11

*Staton v. Boeing Co.*, 327 F.3d 938, 961 (9th Cir. 2003) ............................................27

*Steering Comm. v. Exxon Mobil Corp.*, 461 F.3d 598 (5th Cir. 2006)...........................13

*Strong v. BellSouth Telcoms.*, 137 F.3d 844 (5th Cir. 1998)...................4, 18, 19, 21, 23

*Union Asset Mgmt. v. Dell, Inc.*, 669 F.3d 632, 638-39 (5th Cir. 2012).............................6

*Univ. of Utah v. United States*, 2008 U.S. Dist. LEXIS 78185,(D. Utah Oct. 6, 2008)...........16

*U.S. v. City of Miami, Fla.*, 614 F.2d 1322 (5th Cir. 1980), *modified on other*
  *grounds*, 664 F.2d 435 (5th Cir. 1981) ......................................................................4

*Vizcaino v. Microsoft Corp.*, 290 F.3d 1043 (9th Cir. 2002)........................................23

*Weinberger v. Great N. Nekoosa Corp.*, 925 F.2d 518 (1st Cir. 1991)...........19, 20, 23

*STATUTES:*

33 U.S.C. § 2704.................................................................................................................1

Fed. R. Civ. P. 23(b)(3) ..................................................................................................11

*OTHER AUTHORITIES:*

American Law Institute, *Principles of the Law of Aggregate Litigation* § 3.05(b)..................4, 18

American Law Institute, *Principles of the Law of Aggregate Litigation* § 3.05(c) ......................4

Department of Justice Office of Public Affairs, "Audit of Gulf Coast Claims
      Facility Results in $64 Million in Additional Payments" (Apr. 19, 2012)...................1

BDO Consulting, *Independent Evaluation of the Gulf Coast Claims Facility:*
      *Report of Findings & Observations to the Department of Justice* (June 5, 2012)............1

Charles Silver, *Due Process and the Lodestar Method*, 74 Tul. L. Rev. 1809 (2000).................22

Eric A. Posner, "The Other Value of Life," *The New Republic* (Jul. 31, 2012).......................1

Eric P. Voigt, *A Company's Voluntary Refund Program for Consumers Can be a*
      *Fair and Efficient Alternative to a Class Action*, 31 Rev. Litig. 617,
      635 (2012)............................................................................................... 14-16

Federal Judicial Center, *Manual for Complex Litigation (Fourth)* § 21.71(2004).......................25

George Talbot, "Ken Feinberg: 'The GCCF did what it said it would do'", (Apr. 21, 2012).......5

Independent Evaluation of the Gulf Coast Claims Facility: Report of Findings &
      Observations to the U.S. Dept. of Justice (BDO Consulting, June 15, 2012)...............5

Norman Sabbey, Comment, *Rule 23: Categories of Subsection (b)*,
      10 B.C. Indus. & Com. L. Rev. 539 (1968-69) ................................................15

Report of the Third Circuit Task Force, *Court Awarded Attorney Fees*,
      108 F.R.D. 237 (1985)..........................................................................................19

Ronald E. Young, *Federal Rules of Civil Procedure: Rule 23, The Class*
      *Action Device and Its Utilization*, 22 U. Fla. L. Rev. 631 (1970).......................15

## Summary of Objection

As plaintiffs correctly state, "This class settlement is unique." Docket No. 7104 at 1. But it is unique in an unprecedented way that requires rejection of the settlement.

For well over a year before the settlement was announced, the BP defendants had established and administered a multi-billion dollar fund, the Gulf Coast Claims Facility ("GCCF"), administered by the most respected claims administrator in American history, Kenneth Feinberg. Moreover, on October 18, 2010, BP filed papers in this proceeding where they (1) conceded that they were a "Responsible Party" under the Oil Pollution Act, 33 U.S.C. § 2704, and (2) agreed to "pay all legitimate claims, regardless of the OPA statutory limit of liability," subject to a right of contribution. Docket No. 559. An audit commissioned by the Department of Justice found that the Feinberg GCCF issued $6.2 billion of claims while only underpaying this tremendous volume by only $64 million, barely 1%. *See* Eric A. Posner, "The Other Value of Life," *The New Republic* (Jul. 31, 2012) (praising Feinberg's efficiency and concluding "This is impressive, and suggests that Feinberg has much to be proud of"); BDO Consulting, *Independent Evaluation of the Gulf Coast Claims Facility: Report of Findings & Observations to the Department of Justice* (June 5, 2012). And BP quickly moved to rectify the small number of underpayments. Department of Justice Office of Public Affairs, "Audit of Gulf Coast Claims Facility Results in $64 Million in Additional Payments" (Apr. 19, 2012). It is only with this background that putative class counsel has negotiated a settlement—that, by definition, can provide no more money than the unlimited funds BP had already promised.

The settlement may make some class members better off—but, as many class members have objected, it also makes many class members worse off than they would have been with the

existing Feinberg GCCF process. Class counsel has replaced the GCCF with a much more burdensome claims process that will likely reduce BP's agreed-upon liability—and for this class counsel has surrendered any claim for punitive damages against BP, though there is no question that the defendants, with a market capitalization of $133 billion, have the ability to pay any such punitive damages. These intra-class conflicts require separate representation; the class cannot be certified under Rule 23(a)(4).

The $600 million class counsel seeks—and the $75 million they have already received— is thus untenable. It is based on what the class receives in the settlement, but that calculation does not include the figure of what the class has surrendered—rights to compensation for "all legitimate claims, regardless of the OPA statutory limit of liability" under the lauded Feinberg GCCF. So class counsel becomes unimaginably wealthy; BP is relieved of the risk of punitive damages; and the class gets nothing that they wouldn't have had before. Indeed, unpaid class members were further hurt (and BP benefited) when BP stopped Feinberg GCCF payments to transition to the class settlement formulas. Rule 23(a)(4) certification is thus unavailable for a second reason: class representatives have agreed to a settlement that does nothing more than what BP was already doing, and their decision to put the interests of class counsel and BP ahead of the absent class members they are supposed to represent proves their inadequacy. *In re Aqua Dots Products Liability Litigation*, 654 F.3d 748 (7th Cir. 2011).

The class cannot be certified for a third reason: because there was already a GCCF claims process, a class action is not superior to the pre-existing claims process, and thus cannot be certified under Rule 23(b)(3), which requires that "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."

Even if the class could be certified, the settlement cannot be approved as fair. The abusive $600 million request—together with an unprecedented $75 million advance—demonstrates all three signs of impermissible collusion identified by the Ninth Circuit in *In re Bluetooth Headset Products Liability Litigation.* 654 F.3d 935 (9th Cir. 2011). The fees are wildly disproportionate to the marginal benefit of the settlement (which, as mentioned above, is negative for many class members) over the Feinberg GCCF. But class counsel has also negotiated a "clear sailing" provision prohibiting BP from challenging the fees at the expense of the class. Moreover, even if the court were to cure these problems, the reduction in the excessive award would unfairly revert back to the defendant. Such a settlement structure means that class counsel has put their interests ahead of the class, and such self-dealing precludes settlement approval.

There is a second independent reason the settlement cannot be considered fair. BP has the right to appeal awards in the class action claims process. The awards to the class are therefore entirely indeterminate and subjective. Neither class members nor the court can evaluate in advance what they will be paid. This precludes approval as a matter of law.

Finally, the parties have committed multiple violations of Rule 23(h), by agreeing to a payment to class counsel before the class has had an opportunity to object to the settlement, and by failing to justify their proposed fee award before the objection deadline.

For these reasons, Hunter and Judith Armour object to the settlement and the proposed $600 million in fees. Their address is 6200 Siquenza Drive, Pensacola, Florida 32507. Their phone number is (850) 492-3474. The proof of their class membership can be found in their attached declarations and exhibits. In addition to the law and arguments herein, the Armours join

and adopt the objections filed by any other objectors, including the evidence and exhibits in support of those objections, to the extent those objections are not inconsistent with the Armours' arguments.

## I.   The Court Must Protect Absent Class Members and Give Special Scrutiny to a Pre-Certification Settlement.

This Court has a "duty under Rule 23 of the Federal Rules of Civil Procedure to protect absent class members and to police class action proceedings." *Strong v. BellSouth Telecommunications, Inc.,* 137 F.3d 844, 849 (5th Cir. 1998); *Ibarra v. Texas Employment Comm'n,* 823 F.2d 873, 878 (5th Cir. 1987); *U.S. v. City of Miami, Fla.*, 614 F.2d 1322, 1330-31 (5th Cir. 1980), *modified on other grounds,* 664 F.2d 435 (5th Cir. 1981).

"[T]he burden is on the settlement proponents to persuade the court that the agreement is fair, reasonable, and adequate for the absent class members who are to be bound by the settlement." *In re Katrina Canal Breaches Litig. v. Bd. of Comm'rs,* 628 F.3d 185, 196 (5th Cir. 2010); *accord* American Law Institute, *Principles of the Law of Aggregate Litigation* § 3.05(c). The settling parties have failed to meet that burden.

The settling parties refer to the *Reed* factors of *Reed v. Gen. Motors, Corp.,* 703 F.2d 170, 172 (5th Cir. 1983). But they fail to mention that the *Reed* factors are only a starting point and are not sufficient for settlement approval by themselves. *E.g., Katrina Canal Breaches,* 628 F.3d at 195 ("Without quarreling with the district court's findings [regarding the *Reed* factors], we nevertheless conclude that this settlement is not fair, reasonable, and adequate under Rule 23(e)").

## II.     The Class Cannot Be Certified.

Long before the settlement was negotiated, BP had already promised and provided a highly effective and highly lauded claims process that provided rapid compensation to class members. The GCCF, which was created in the immediate aftermath of an unprecedented environmental catastrophe, "was among the largest claims processing facilities in U.S. history." Independent Evaluation of the Gulf Coast Claims Facility: Report of Findings & Observations to the U.S. Dept. of Justice (BDO Consulting, June 15, 2012) at 56. Despite facing momentous challenges and public criticism, the GCCF paid out a total of over $6.2 billion to over 220,000 individual and business claimants during the one-and-a-half-years of the program's existence. *Id.* at 59; see also George Talbot, "Ken Feinberg: 'The GCCF did what it said it would do'", (Apr. 21, 2012), (interview with Feinberg in which Feinberg describes the GCCF as "a very speedy, efficient way to get money out, in light of an unprecedented environmental disaster").

Because the settlement eliminates this process without ensuring that every class member is made at least as well off by the elimination of the GCCF, intra-class conflicts constitutionally preclude class certification in the absence of separate class representation for each of the affected subgroups. Moreover, the existence of the claims process means that the settlement is negotiated for the $600 million benefit of the attorneys, rather than for the class, which further precludes certification Rule 23(a)(4) and Rule 23(b)(3).

## A.     The Class Representatives Do Not Satisfy Rule 23(a)(4)

As the settling parties concede, settlement approval and the U.S. Constitution require a finding of adequacy of class representatives under Rule 23(a)(4). The Rule 23 adequacy inquiry is intended to uncover "conflicts of interest between the named plaintiffs and the class they seek

to represent." *Berger v. Compaq Computer Corp.*, 257 F.3d 475, 479-80 (5th Cir. 2001) (*quoting Amchem Prods. v. Windsor*, 521 U.S. 591, 625, (1997)). The settling parties cannot meet this constitutional requirement.

### 1.      Intra-Class Conflicts Preclude Certification.

A "district court has a duty under Fed. R. Civ. P. 23(e) to ensure that [a settlement] is fair, adequate, and reasonable and is not the product of collusion between the parties. Thus Rule 23(e) provides a check against settlement dynamics that may 'lead the negotiating parties— even those with the best intentions—to give insufficient weight to the interests of at least some class members.'" *In re Vitamins Antitrust Class Actions,* 215 F.3d 26, 30 (D.C. Cir. 2000). Unfortunately, insufficient weight was given to multiple groups of class members.[1] This precludes certification as a matter of law. As Judge Smith noted in dissent in *In re Asbestos Litigation,* class "representative must possess the same interest and suffer the same injury as the class members and must be aligned in interest such that no conflicts exist between the representative and any discrete subclasses within the broader class he purports to represent. *Amchem* demands a structural assurance of fair and adequate representation for the diverse groups and individuals affected." 134 F.3d 668, 677 (5th Cir. 1999). That dissent was vindicated when the Supreme Court reversed the Fifth Circuit for just this reason in *Ortiz v. Fibreboard Corp.*, 527 U.S. 815 (1999). This Court should not repeat the error, and must deny class certification.

---

[1] In the Fifth Circuit, any class member has the right to object to the unfairness of the settlement to any class member. *Union Asset Mgmt. v. Dell, Inc.*, 669 F.3d 632, 638-39 (5th Cir. 2012) ("Any class member has standing to object to a class settlement").

First, some class members have been geographically reclassified to receive less compensation than they would have received under the Feinberg GCCF; other class members are victimized by a change in compensation formulas. Thus, next-door neighbors who suffered identical losses could receive wildly different compensation if one submitted a Feinberg GCCF claim form successfully in 2011 and another failed to navigate the claims process until after this settlement dissolved the Feinberg GCCF and replaced it with a different zone map. To the extent the settlement pays newer claims less than what they would have been paid under the Feinberg GCCF, it makes those class members worse off. That some class members can be said to benefit just shows the intra-class wealth transfer and conflict that precludes a finding of that a single set of class representatives can represent a single class. It is clear that many class members would be better off if the settlement had not been negotiated for the benefit of other class members. An opt out does not solve this problem, because the settlement has taken away the option of accessing the Feinberg GCCF. A clearer intra-class conflict is harder to imagine.

*Langbecker v. Elec. Data Sys. Corp.*, 476 F.3d 299 (5th Cir. 2007), is precisely on point. There, the Fifth Circuit refused certification because the class representatives sought "injunctive relief that would dissolve the EDS Stock Fund; the Fund cannot be partially shut down for the litigating Plaintiffs and remain open for absent class members who desire this investment option." *Id.* at 315. This case is *worse* than *Langbecker*, because this Court permitted exactly the injunctive relief *in the middle* of the case that *Langbecker* said was not permissible at *final judgment*: eliminating a fund option—here the highly effective Feinberg GCCF—that some class members would prefer.

Plaintiffs' claim that "class members and their negotiators were not competing with each other maximize [sic] their respective shares of a pre-limited fund" (Docket No. 7104 at 44) beggars belief. If that were true, there would be no need to renegotiate the geographic zones or the compensation formulas of the Feinberg GCCF. The parties could start with the Feinberg GCCF baseline, and negotiate upward from there to create compensation for the released punitive damages claims. Instead, the class counsel sold out several swaths of the class, likely in anticipation of the hundreds of millions of dollars of attorneys' fees that, while technically not negotiated at the same time, were not a surprise to any of the participants when they were requested separately.

Second, class members who planned to file claims in the spring of 2012 were unfairly victimized by being unable to do so in the transition period when the Feinberg GCCF was shut down. These class members deserve separate representation, but failed to get it. This intra-class conflict, where some class members were penalized for the benefit of other class members, precludes class certification.

Third, the settlement establishes a set of bonus payments for residents of Louisiana that the rest of the class is not eligible for. A lightly oiled wetland property just inside the Louisiana border is eligible for gigantic windfalls, but someone just a few miles west or east but outside of Louisiana will receive tens of thousands of dollars less even if they suffered much worse oiling by the objective SCAT measure. *See* Settlement Exhibit 12A at ¶ 1.E (only Louisiana residents eligible for Wetland Real Property Claims); *id.* at ¶ 1.D (SCAT rating of "lightly oiled" creates eligibility for "Compensation Category A"); *id.* at ¶ 2.C.vi.a *and* ¶ 2.C.ix.a (compensation of $25,000/acre with minimum of one acre). This cannot be justified by Louisiana state law: this

Court has already ruled that federal law preempts any state-law remedies for the spill, and the class complaint explicitly disclaimed any state-law claims. Thus class members outside of Louisiana require separate representation that does not have the plain conflicts with Louisiana wetland property owners.[2]

### 2.    *In re Aqua Dots* **Precludes Class Certification.**

Judge Easterbrook's opinion in *In re Aqua Dots* is also precisely on point. 654 F.3d 748 (7th Cir. 2011). The defendant toy manufacturer had agreed to provide refunds to class members before the litigation began. The Seventh Circuit affirmed a refusal by the district court to certify a class: because the class action sought relief that the defendant was already providing, the only purpose of the class action was wasteful litigation to generate fees for the class counsel at the expense of the class. This precluded a finding of Rule 23(a)(4) adequacy, because it demonstrated that the class representatives did not have the best interests of the class at heart. "A representative who proposes that high transaction costs (notice and attorneys' fees) be incurred at the class members' expense to obtain a refund that already is on offer is not adequately protecting the class members' interests." 654 F.3d at 752.

The same is true here, except, once again, the case at bar presents a *worse* scenario than *In re Aqua Dots*: BP *had* a highly effective compensation program in the form of the Feinberg GCCF, but the class representatives here eliminated it to rationalize a class action settlement

---

[2] It is worth noting that plaintiffs elide this issue in their brief: they incompletely claim that "Compensation schemes for Wetlands Real Property are based on whether parcels were directly affected with oil," Docket No. 7104 at 13, without mentioning that heavily oiled wetlands in Mississippi, Alabama, Florida, and Texas are ineligible for Wetlands Real Property compensation.

where their attorneys would collect hundreds of millions of dollars of fees. This scenario precluded class representative Rule 23(a)(4) adequacy in *Aqua Dots*, and it does so here, too.

### 3. The Upside-Down Class Representative Selection Precludes Class Certification.

The "unique" nature of this case trumpeted by the settling parties demonstrates why it is inappropriate to certify as a class action. First, there was a Plaintiffs' Steering Committee; then there were settlement negotiations; and only then did the PSC select class representatives to ratify a *fait accompli*. But a look at the class complaint show numerous geographically dispersed class representatives who have nothing in common, and likely have never met, yet seek to represent a single class. How could they possibly be organized enough to do so? *Buettgen v. Harless*, 263 F.R.D. 378 (N.D. Tex. 2009), is directly on point. There, as here, the group of class representatives "fail[ed] to present evidence that the group have ever communicated in a meaningful way." Thus, class certification was not possible. If "named plaintiffs are not [talking] to each other, then it is unlikely that they can oversee their counsel independently." Andrew Trask, "Adequacy and Commitment: *Buettgen v. Harless*," McGuire Woods (Sep. 7, 2010). When a group like this set of class representatives is "not cohesive, then it is likely that it was put together by plaintiffs' counsel" to meet litigation objectives, thus "implying that the counsel controlled the plaintiffs." *Id.* When this happens, it makes a mockery of the class action process, and Rule 23(a)(4) adequacy cannot be satisfied: the "willing pawn of counsel" cannot be appointed class representative, because they cannot meaningfully supervise class counsel when they have been handpicked to rubber-stamp class counsel's decisions. *In re Monster Worldwide, Inc. Secs. Litig.*, 251 F.R.D. 132, 135-36 (S.D.N.Y. July 14, 2008).

**B.    A Class Action Is Not a Superior Means of Resolution When There Was Already an Existing Claims Process.**

In addition to manifesting a predominance of common issues and satisfying each Rule 23(a) prerequisite, a valid (b)(3) certification requires demonstrating that the class action device "is superior to other available methods for fairly and efficiently adjudicating the controversy." *Madison v. Chalmette Ref., L.L.C.*, 637 F.3d 551, 555 (5th Cir. 2011) (quoting Fed. R. Civ. P. 23(b)(3)). "A class action is 'superior' for purposes of Rule 23(b)(3)  when it is clearly better than, 'and not just as good as, other available methods for handling the controversy.' *Puerto Rico v. M/V Emily S*, 158 F.R.D. 9, 15-16 (D.P.R. 1994) (quoting *Beebe v. Pac. Realty Trust*, 99 F.R.D. 60, 73 (D. Or. 1983)). As with all the rule 23 prerequisites, it is the party seeking certification who bears the burden of proof on the question of superiority. *Robinson v. Tex. Auto. Dealers Ass'n*, 387 F.3d 416, 421 (5th Cir. 2004). Aside from the solitary concern of trial management, which may be allayed through settlement, the other strictures of Rule 23(b)(3) superiority, "designed to protect absentees by blocking unwarranted or overbroad class definitions—demand undiluted, even heightened, attention in the settlement context." *Amchem*, 521 U.S. at 620. *See also Georgine v. Amchem Prods.*, 83 F.3d 610, 617 ("the 23(b)(3) requirements protect the same interests in fairness and efficiency as the 23(a) requirements"). For several independent reasons the settling parties cannot make the necessary demonstration of superiority in the case at bar: (1) The claims in this case are of positive, not negative value; (2) Individual issues predominate which cry out for decentralized control of litigation; and perhaps most importantly (3) BP's voluntary and governmentally overseen Gulf Coast Claims Facility is an equally effective remedial measure that undercuts the superiority of the class action mechanism here.

First, as in *Allison v. Citgo Petroleum Corp.*, 151 F.3d 402 (5th Cir. 1998), "the most compelling rationale for finding superiority in a class action—the existence of a negative value suit—is missing in this case." *Id.* at 420 (quoting *Castano v. Am. Tobacco Co.*, 84 F.3d 734, 748 (5th Cir. 1996) and citing *Amchem*, 521 U.S. at 617). "A negative value suit is one in which class members' claims would be uneconomical to litigate." *In re Monumental Life Ins. Co.*, 365 F.3d 408, 411 n.1 (5th Cir. 2004) (internal quotation omitted). There can be no dispute here that the central economic and compensatory damages claims of this lawsuit are astronomical and present "ample incentive" for class members to proceed on an individual basis—indeed, the class action adds nothing here, because class members cannot recover unless they submit the same sort of detailed claims (and, in most instances, more detailed claims) with the assistance of counsel that they needed to before this settlement dissolved the Feinberg GCCF. *Bevrotte v. Caesars Ent. Corp.*, 2011 U.S. Dist. LEXIS 114463, at *16 (E.D. La. Oct. 4, 2011). *Accord Georgine v. Amchem Prods.*, 83 F.3d 610, 633 (3d Cir. 1996), *aff'd sub nom Amchem Prods. v. Windsor*, 521 U.S. 591 (1997); *In re GMC Dex-Cool Prods Liab. Litig.*, 2006 U.S. Dist. LEXIS 74503, at *23-*25 (S.D. Ill. Sept. 27, 2006) (collecting cases). Even minor property infringement claims that do not arise out of a mass tort are not viewed as so insubstantial as to be characterized as negative value claims, notwithstanding the fact that some putative class members only owned small tracts of land. *Corley v. Entergy Corp.*, 220 F.R.D. 478, 490 (E.D. Tex. 2004)

Even for those class members with meager aggregate damages claims, the ability to seek punitive damages and/or attorneys' fees renders their claims of non-negative value. *In re Ford Motor Co. Bronco II Prods. Liab. Litig.*, 177 F.R.D. 360, 375 (E.D. La. 1997) (citing *Castano*, 84 F.3d at 748). *Compare* Amended Complaint (Dkt. No. 6412) at 131-36 (seeking punitive

damages on all claims; Prayer for Relief (c) (punitive damages); Prayer for Relief (e) (attorneys' fees). Ultimately, *Castano*'s holding is dispositive: when damages are high and punitive damages are available, individual suits are feasible and a class action is not superior. 84 F.3d at 748.

Second, superiority is undermined by the predominance of individualized issues related to the calculation of damages. As explained by the Fifth Circuit, "[t]he greater number of individual issues, the less likely superiority can be established." *Castano*, 84 F.3d at 745 n.19. The "symbiotic relationship"[3] between predominance and superiority and the interplay therein undergirds "the general rule" that class action resolution is not superior for dealing with mass torts. *Steering Comm. v. Exxon Mobil Corp.*, 461 F.3d 598, 604 (5th Cir. 2006). Despite the plaintiffs' emphasis on the "single-source" nature of the Deepwater Horizon incident,[4] the general rule against class action resolution of mass torts holds true even when mass torts arise out of a single discrete incident. *Id.* at 602; *Robertson v. Monsanto Co.*, 287 Fed. Appx. 354, 362 (5th Cir. 2008) (*per curiam*) (reversing certification and finding no superiority where "issues of causation and damages are highly individualized" notwithstanding that "the alleged cause of the plaintiffs' injuries is a single incident."). Because putative class members have each suffered damages in unique and varied ways, geo-spatially and temporally distinct ways, there is no predominance of common issues and likewise no superiority of the class action procedure. It is only appropriate for individuals to control litigation of their own claims. The settlement requires them to continue to do so in any event, adding no judicial economy.

---

[3] *Baroni v. Bellsouth Telcomms, Inc.*, 2004 U.S. Dist. LEXIS 14403, at * 28 n.54 (E.D. La. 2004) (citing *Allison*).
[4] Plaintiffs' Motion for Final Approval (Dkt. No. 7104), at i, 23, 38, 51.

*Third*, the class action certification and settlement here is not a superior method of resolution here, in light of BP's acknowledgement of culpability and establishment of the Gulf Coast Claims Facility ["GCCF"] under the administration of Kenneth Feinberg and the oversight of the Federal government. Any marginal gains to absent plaintiffs under the terms of the proposed settlement as compared with the terms of the GCCF program are more than offset by the additional costs and expenses incurred during class settlement. "Whenever the principal, if not the only, beneficiaries to the class action are to be the attorneys for the plaintiffs and not the individual class members, a costly and time-consuming class action is hardly the superior method for resolving the dispute." *In re Hotel Tel. Charges*, 500 F.2d 86, 91 (9th Cir. 1974); Eric P. Voigt, *A Company's Voluntary Refund Program for Consumers Can be a Fair and Efficient Alternative to a Class Action*, 31 Rev. Litig. 617, 635 (2012) ("Class settlements, for instance, involve the extra expense of class counsel's fees."). *Cf. also In re Aqua Dots Prods. Liab. Litig.*, 654 F.3d 748, 752 (7th Cir. 2011) ("A representative who proposes that high transaction costs (notice and attorneys' fees) be incurred at the class members' expense to obtain a refund that already is on offer is not adequately protecting the class members' interests."). In deciding whether the class is benefitted by the certification and simultaneous settlement, the Court should compare its provisions against those of the pre-existing GCCF.

Both the Advisory Committee Notes to Rule 23, as well as the writings of Committee member Charles Alan Wright strongly support the proposition that non-judicial alternatives should be considered when inquiring into the superiority of a class action. Voigt, 31 Rev. Litig. at 625. Commentators at the time of the 1966 appending of (b)(3) agreed that the language required a class action to be superior to "any other form of settlement." *Id.* at 629 (citing Norman

Sabbey, Comment, *Rule 23: Categories of Subsection (b)*, 10 B.C. Indus. & Com. L. Rev. 539, 548-49 (1968-69); Ronald E. Young, *Federal Rules of Civil Procedure: Rule 23, The Class Action Device and Its Utilization*, 22 U. Fla. L. Rev. 631, 637 (1970)). "Over the past fifteen years, nine[5] federal district courts have addressed whether a class action may be compared to a refund program and have concluded that such a comparison is appropriate." Voigt, 31 Rev. Litig. at 630-31; *see also id.* at 632-36 (elucidating the errors of the three federal courts that have held that only comparisons with formal adjudicatory procedures are warranted). Although Professor Voigt mentions that both the Fourth and the Ninth Circuits have similarly implied that it is proper to compare class actions with extra-judicial remedies, *id.* at 631 n.54, he neglects to mention that the Supreme Court and Fifth Circuit have implied likewise.

Endorsing the precise remedial method employed by BP here, the *Amchem* Court wrote that "[t]he argument is sensibly made that a nationwide administrative regime would provide the most secure fair, and efficient means of compensating victims of asbestos exposure. 521 U.S. at 628-29. And even more efficiently, Congress did not even have to adopt such a solution (as they would with a judicially certified class) because BP instituted the program voluntarily, although not without government oversight. The Fifth Circuit has also concluded that non-judicial processes can be superior to the class action device. *Castano*, 84 F.3d at 747 n.24 ("The parties can also turn to mediation and arbitration to settle individual or aggregated claims.").

Quite simply, contrary to the plaintiffs' assertions,[6] a superior process does not require judicial intervention.[7] Voigt, 31 Rev. Litig. at 654-55. Voluntary remedial programs have been

---

[5] There are now ten with the inclusion of *Daigle v. Ford Motor Co.*, 2012 U.S. Dist. LEXIS 106172 (D. Minn. July 31, 2012) (denying class certification, finding no superiority on the basis of Ford's voluntary safety recall).

[6] Plaintiffs' Motion for Final Approval (Dkt. No. 7104) at 48.

found superior for cases involving economic loss, property damage, personal injury, cases where aggregate class damages are of a large magnitude. *Id.* at 642-45 (citing cases). Alternative non-class action relief need not be identical to the class action settlement relief. *Cf. Gregory v. Finova Capital Corp.*, 442 F.3d 188, 190-92 (4th Cir. 2006) (holding that the class action was not superior to a bankruptcy proceeding, even though "the relief sought in the two action differed slightly.").[8]

All that is required is that the voluntary remedial program is "fair and efficient"; when it is, "a court must deny class certification." Voigt, 31 Rev. Litig. at 639. Whether a remedial program is "fair and efficient" depends on whether 1. It fully compensates plaintiffs for actual damages, *id.* at 646; 2. It includes an active campaign to notify plaintiffs of its existence, *id* at 646; 3. It does so in a timely fashion, "no longer than the time a class member would be

---

[7] Even assuming *arguendo* that plaintiffs are correct that some form of governmental structural protection or legitimacy is necessary, it was present here. State governments effectively lobbied and threatened litigation to improve the compensation formulas of the GCCF. The Department of Justice held an audit of the Feinberg GCCF, and negotiated compensation for perceived shortfalls. A government investigation alone is enough to preclude a finding of superiority. *See* Steven B. Malach & Robert E. Koosa, *Government Action and the Superiority Requirement: A Potential Bar to Private Class Action Lawsuits*, 18 Geo. J. Legal. Ethics 1419, 1424-26 (2005) (discussing cases in which courts denied class certification based in part on the existence of a governmental investigation); *Univ. of Utah v. United States*, 2008 U.S. Dist. LEXIS 78185, at *13-*22 (D. Utah Oct. 6, 2008) (administrative claims process precludes finding superiority of class action resolution).

[8] It is for this reason, that the six mostly insignificant distinctions that the plaintiffs note between the GCCF and the class settlement relief do not suffice to make the class settlement a superior method of adjudication. In fact, the differences do nothing but exacerbate the intra-class conflicts, discussed above. The plaintiffs' note that the settlement compensates some types of damage that were not being compensated by the GCCF, but fails to note that the marginal gains for some class members are offset by losses to others. The settlement effectuates little more than moving 600 million dollars that may have gone to GCCF claimants to line the pockets of class counsel.

reimbursed via a class action settlement" *id.* at 656; and 4. It conserves judicial resources. *Id.* at 659.

The GCCF program satisfies the standards of fairness and efficiency. It has been administered by the capable special master Kenneth Feinberg; as discussed above, a Department of Justice audit found only $64 million in underpayments in a universe of $6.2 billion of payments and overpayments. In the aggregate, these billions of dollars of payments to claimants evidences not only the level of compensation that has been provided, but the level of notice to potential plaintiffs. Claimant compensation has been provided in a prompt and timely manner. But even beyond the redress of full monetary compensation, BP has voluntarily acknowledged its responsibility in connection with the Deepwater Horizon incident and pledged to the Court to "pay all legitimate claims in an efficient and fair manner". *See* Statement of BP Exploration & Production Inc (Dkt. No. 559). Such an acknowledgment of liability further undermines a finding of class action superiority. *Robertson*, 287 Fed. Appx. at 362 (no superiority when "as far as the issue of liability is concerned, there is simply no gain to be had from using the class action form.")

It is improper to presume that without this certification and settlement there would be judicial meltdown. *Castano*, 84 F.3d at 747 n.24 ("There is reason to believe that even a mass tort…could be managed, without class certification, in a way that avoids judicial meltdown.") (citing *Georgine*). Here, there is no need for such conjecture even: the GCCF had served as an functioning voluntary settlement program for over a year.  In light of the alternate remedial procedure, there is "the very real possibility that the judicial crisis may fail to materialize." *Id.* at 747. And even if the plaintiffs' are correct that judicial economy would be served by a global

settlement, if there is one principle that can be gleaned from *Amchem* and *Ortiz*, it is that efficiency concerns cannot override due process concerns and make an otherwise untenable class a superior solution. To adopt, at this point, a class settlement is not a superior solution for putative class members. Although it surely is superior from the perspective of class *counsel*, fees are a class expense, not a benefit. *Hotel Tel. Charges*, 500 F.2d at 91; *Aqua Dots*, 654 F.3d at 751.

## III.     The Settlement Is Unfair.

Even if the intra-class conflicts, lack of representative adequacy, and lack of class action superiority could be ignored, and the class could be certified, the settlement cannot be approved as fair under Rule 23(e).

## A.     *Strong* and *Bluetooth* Preclude Settlement Approval.

While *Katrina* makes clear that the six *Reed* factors are not the sole reasons a settlement should be rejected as unfair, unreasonable or inadequate under Rule 23(e), the Fifth Circuit wisely did not attempt to catalog an exclusive list of what may constitute grounds for rejection. *Katrina,* 628 F.3d at 195; *accord* American Law Institute, *Principles of the Law of Aggregate Litigation* § 3.05(b) (a "settlement may also be found to be unfair for any other significant reason that may arise from the facts and circumstances of the particular case"). In analyzing the fairness of a proposed settlement under Rule 23(e), this Circuit, does however, command district courts to "always consider the possibility that an agreement reached by the class attorney is not in the best interest of the class," and beware of settlements which enrich class counsel to a greater degree than they do absent class members. *Pettway v. Am. Cast Iron Pipe Co.*, 576 F.2d 1157, 1215-16 (5th Cir. 1978).

This consideration extends beyond the *Reed* factor requiring a finding of non-collusion and non-fraud. "Even when the district court finds the settlement agreement to be untainted by collusion, fraud, and other irregularities, the court must thoroughly review the attorneys' fees agreed to by the parties in the proposed settlement agreement." *Strong v. BellSouth Telcoms.*, 137 F.3d 844, 850 (5th Cir. 1998). *Accord* Report of the Third Circuit Task Force, *Court Awarded Attorney Fees*, 108 F.R.D. 237, 266 (1985) (Even if the plaintiff's attorney does not consciously or explicitly bargain for a higher fee at the expense of the beneficiaries, it is very likely that this situation has indirect or subliminal effects on the negotiations."

The *Strong* court recognized that certain structural provisions designed to benefit class counsel can give rise to an inference of unfairness. *Id.* ("[W]hen fees are paid from the defendant's own funds, a conflict results from 'the danger that the lawyers might urge a class settlement at a low figure or on a less-than-optimal basis in exchange for red-carpet treatment on fees.'" (quoting *Weinberger v. Great N. Nekoosa Corp.*, 925 F.2d 518, 524 (1st Cir. 1991)). The Ninth Circuit agrees; it recently identified a non-exhaustive[9] list of three warning signs of a class action settlement that is inequitable as between class counsel and the class. *In re Bluetooth*

---

[9] Additional indications of a self-dealing settlement are present as well. Class counsel has arranged that they will be paid 480 million dollars even in event that final approval is not granted. Such a provision cannot be in the class' interest. Settlement Agreement, Exhibit 27, ¶ 4.d ("Fee Agreement") (Docket No. 6430-46). This provision serves only to divorce the interests of class counsel from the class. Moreover, class counsel entitled themselves to 75 million dollars before final approval is granted. Fee Agreement ¶ 4.a. A pre-pay provision of this nature is unheard of and both provisions violate Rule 23(h), which permits fees to be awarded to class counsel only upon notice to the class. *See* Section IV, below.

*Headset Prods. Liab. Litig.*, 654 F.3d 935, 947 (9th Cir. 2011). As in *Bluetooth*, each of these of these "multiple indicia" of unfairness are present in this pre-certification settlement.[10]

The first and second *Bluetooth* indicia of an unfair settlement are procedural: they are 1. the presence of a "clear-sailing" agreement, such that the defendant will not challenge the award of fees to plaintiffs' counsel, and 2. A segregated fee fund such that any dimunition in those fees reverts to the defendant rather than redounding to the class' benefit (i.e. the "kicker"). *Bluetooth*, 654 F.3d at 947. This proposed settlement includes both a clear-sailing agreement and a segregated fee fund. Fee Agreement ¶ 2 (clear-sailing agreement); ¶ 4 (segregated fee fund) (citing Settlement Agreement § 5.16).

In conjunction, both provisions indicate that the class attorneys have negotiated to protect their fee award at the expense of potential class benefits. *See Weinberger v. Great N. Nekoosa Corp.*, 925 F.2d 518, 525 (1st Cir. 1991) ("[A clear-sailing] clause by its very nature deprives the court of the advantages of the adversary process."); *Bluetooth*, 654 F.3d at 949 ("[T]he kicker deprives the class of that full potential benefit if class counsel negotiates too much for its fees"). At a minimum, these two clauses serve as warning signs of a self-serving settlement that badly needs justification: why was this negotiated in such a manner to make the class worse off? *Id.*

Oddly, despite this precedent condemning the practice, the plaintiffs tout the segregated fee fund as a virtue of the settlement's structure. Motion for Final Approval (Dkt. No. 7104) at 52. In doing so, they "disregard the economic reality that a settling defendant is concerned only

---

[10] Pre-certification settlements demand heightened scrutiny. "[W]here, as here, class counsel negotiates a settlement agreement before the class is even certified, courts "must be particularly vigilant not only for explicit collusion, but also for more subtle signs that class counsel have allowed pursuit of their own self-interests and that of certain class members to infect the negotiations." *Dennis v. Kellogg Co.*, ---F.3d---, 2012 U.S. App. LEXIS 14385, at *9-*10 (9th Cir. July 13, 2012) (quoting *Bluetooth*, 654 F.3d at 947).

with its total liability." *Strong*, 137 F.3d at 849. "That the defendant will pay the attorneys' fees from its own funds likewise does not limit the court's obligation to review the reasonableness of the agreed-to fees." *Id. Accord In re GMC Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 821 (3d Cir. 1995) ("[P]rivate agreements to separate fee and settlement arrangements cannot transform what is in economic reality a common fund situation into a statutory fee shifting case."); *Johnson v. Comerica*, 83 F.3d 241, 246 (8th Cir. 1996) ("[I]n essence the entire settlement amount comes from the same source. The award to the class and the agreement on attorney fees represent a package deal.").[11]

Because this economic reality cannot be avoided, the separation of fee from class fund[12] only serves to exacerbate the conflict between attorney and client by creating the unattractive

---

[11] There is, unfortunately, one material difference when there is no common fund: the district court cannot rewrite the settlement agreement to ensure that the class gets a proportional share of the award. If the district court reduces the attorneys' fee request in any way, the money reverts to the defendants, rather than to the class. The design of this settlement suggests that plaintiffs' attorneys were putting their own interests ahead of those of the class claimants, another reason why Rule 23(a)(4) adequacy should not be found.

[12] Plaintiffs also laud the separate negotiation of fee and class fund. Motion for Final Approval at 52. However, such separation does nothing to allay any conflict unless "fee negotiations [are] postponed until the settlement has been judicially approved, not merely until the date the parties allege to have reached an agreement." *In re Cmty. Bank of N. Va. & Guar. Nat'l Bank of Tallahassee Second Mortg. Litig.*, 418 F.3d 277, 308 (3d Cir. 2005) (quoting *GM Pick-Up*, 55 F.3d at 804). Here the consummation of the entire settlement agreement is expressly contingent on "the material term and condition precedent" of reaching an agreement on fees. Settlement Agreement § 14.1 (Dkt. No. 6430-1). As such, any notion that BP's reservation price for total liability somehow did not affect the negotiations of the settlement is false.

More generally, the settling parties are rational economic actors: even when the negotiations over fees are severed, the parties know in advance that those negotiations are coming, that the defendants have a reservation price based on their internal valuation of the litigation, and that every dollar negotiated for the class reduces the amount the defendants are willing to pay class counsel. Because these future fee negotiations are not an unexpected surprise, the overhang of the future fee negotiations necessarily infects the earlier settlement negotiations. This is invariably at the expense of the class when there is a separate fund for fees, because both class counsel and the defendants have an incentive to leave extra "space" for that future negotiation in

consequence that any reduction in fees cannot redound to the class' benefit. A "kicker arrangement reverting unpaid attorneys' fees to the defendant rather than to the class amplifies the danger" that is "already suggested by a clear sailing provision." *Bluetooth*, 654 F.3d at 949. "The clear sailing provision reveals the defendant's willingness to pay, but the kicker deprives the class of that full potential benefit if class counsel negotiates too much for its fees." *Id.* "If the defendant is willing to pay a certain sum in attorneys' fees as part of the settlement package, but the full fee award would be unreasonable, there is ***no apparent reason*** the class should not benefit from the excess allotted for fees." *Bluetooth,* 654 F.3d at 949 (emphasis added). The reversion of an oversized fee request to the defendant is *per se* self-dealing that makes the settlement inherently unfair under Rule 23(e).[13]

In addition, a "kicker" will likely have the additional self-serving effect of protecting class counsel by deterring scrutiny of the fee award. A court has less incentive to scrutinize a fee award, because the kicker combined with the clear sailing agreement means that any reversion will only go to the defendant that had already agreed to pay that amount. Charles Silver, *Due Process and the Lodestar Method*, 74 Tul. L. Rev. 1809, 1839 (2000) (such a fee arrangement is "a strategic effort to insulate a fee award from attack"). Secondly, the kicker deters scrutiny of class counsel in another way: under current law, objectors are not entitled to fees unless they

---

a bifurcated negotiation that the parties do not need to have when it is simply negotiating for a single pot of money to go into a common fund. *Cf. Bluetooth*, 654 F.3d at 948-49 (neither presence of neutral mediator nor separation of fee negotiations from other settlement negotiations demonstrates that a settlement is fair).

[13] There is no compelling basis for this court to avoid the counsel of the many persuasive cases that culminated in *Bluetooth*. The Fifth Circuit avoids creating a circuit split in the absence of persuasive reasons. *New Orleans Depot Servs. v. Dir.*, ---F.3d---, 2012 U.S. App. LEXIS 15336, at *18 n.6 (5th Cir. July 25, 2012) ("We are always chary to create a circuit split.") (quoting *Alfaro v. Commissioner*, 349 F.3d 225, 229 (5th Cir. 2003)).

---

provide a substantial benefit to the class. *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1052 (9th Cir. 2002). But because a reduction of fees in a kicker settlement revert to the defendant, a good-faith objector seeking to benefit the class at large has no financial incentive to object to the fee arrangement.

Meanwhile the clear-sailing clause, by definition, prohibits the defendant from scrutinizing the fee award. The clause "suggests, strongly," that its associated fee request should go "under the microscope of judicial scrutiny." *Weinberger*, 925 F.2d at 518, 525; *Childs v. United Life Ins. Co.*, No. 10-CV-23-PJC, 2012 U.S. Dist. LEXIS 70113, at *13-14 & n.6 (N.D. Okla. May 21, 2012). It lays the groundwork for lawyers to "urge a class settlement at a low figure or on a less-than-optimal basis in exchange for red-carpet treatment on fees." *Id.* at 524; *accord Bluetooth*, 654 F.3d at 948.

To repeat, the schematic design of the fee award has two consequences: to inflate the fee at the class's expense; and to reduce the court's incentive to carefully scrutinize the fee for unreasonableness, since any reductions benefits only the defendant. Any fee that a defendant agrees to pay directly to class counsel is an amount that it presumptively would have been willing to include as part of the payment to the class. "The court's review of the attorneys' fees component of a settlement agreement is thus an essential part of its role as guardian of the interests of class members." *Strong*, 137 F.3d at 850. Unless the settlement is modified such that any reduction in fees is used to augment class recovery rather than reverting to the defendant, it must be rejected as structurally unfair.

The third *Bluetooth* indicia of an unfair settlement is substantive and perhaps the most important of all. It is "when counsel receive a disproportionate distribution of the settlement"

relative to that benefit which they confer upon class members. *Bluetooth*, 654 F.3d at 947; *see also In re Elec. Data Sys. Corp. "ERISA" Litig.*, 2005 U.S. Dist. LEXIS 17457, at *23 n.5 (E.D. Tex. Jun. 30, 2005) ("Although it may be uncommon for courts to scrutinize a settlement based upon counsel receiving too much and plaintiff receiving too little, it is hardly unprecedented.") (collecting cases). A settlement occasions a comparison between the benefit conferred and class counsel's award. There is no question that the settlement authorizes attorneys' fees and costs of $600 million. Fee Agreement ¶ 2. The key issue lies in determining how to measure the benefit conferred in this case. The burden, of course, in proving the quantum of benefit lies with the proponents of the settlement. *Katrina*, 628 F.3d at 196. They must demonstrably show that the settlement "secures some adequate advantage for the class." *Id.* at 195.

Instead of making a legitimate showing of the benefit conferred, however, the plaintiffs rely in their Motion for Final Approval, at 52, on a $7.8 billion figure referenced but not questioned in the Report of Robert H. Klonoff (Dkt. No. 7101-5) at ¶ 94. Klonoff, in offering that valuation, in turn relied on the 2011 BP Annual Report and Form 20-F.[14] Methodologically relying on that figure suffers from at least two devastating errors: 1) It incorrectly presumes that the benefit to the class is the *projected cost* to the defendant; 2) It includes no offset for the benefit that BP would have conferred independently under the pre-settlement status quo ante, benefit for which the settlement is not a but-for cause.

---

[14] *available at*
http://www.bp.com/assets/bp_internet/globalbp/globalbp_uk_english/set_branch/STAGING/common_assets/bpin2011/downloads/BP_Annual_Report_and_Form_20F_2011.pdf.

BP's annual report states simply that "BP estimates the cost of the proposed settlement would be approximately $7.8 billion[15] (including the $2.3 billion commitment to help resolve economic loss claims related to the Gulf seafood industry)." Annual Report at 163. However, "the standard [under rule 23(e)] is not how much money a company spends on purported benefits, but the value of those benefits to the class." *Bluetooth*, 654 F.3d at 944 (quoting *In re TD Ameritrade Accountholder Litig.*, 266 F.R.D. 418, 423 (N.D. Cal. 2009)). *Accord Charles v. Goodyear Tire & Rubber Co.*, 976 F. Supp. 321, 325 (D. N.J. 1997); *O'Keefe v. Mercedes-Benz USA, L.L.C.*, 214 F.R.D. 266, 304-05 (E.D. Pa. 2003).

This follows from a recognition that the "key consideration in determining a fee award is reasonableness in light of the benefit *actually conferred*" (emphasis in original). *In re HP Inkjet Printer Litig.*, No. 5:05-cv-3580 JF, 2011 WL 1158635, at *10 (N.D. Cal. Mar. 29, 2011) (quoting *Create-A-Card Inc., v. Intuit, Inc.*, No. C 07-06452 WHA, 2009 WL 3073920, at * 3 (N.D. Cal. Sept. 22, 2009). *See also In re Prudential Ins. Co. America Sales Practices Litig.*, 148 F.3d 283, 338 (3d Cir. 1998) (quoting Conte, 1 *Attorney Fee Awards* § 2.05, at 37); Federal Judicial Center, *Manual for Complex Litigation (Fourth)* § 21.71(2004) ("the fee awards should be based only on the benefits actually delivered.").

But there is a more fundamental problem with the $7.8 billion valuation. It wrongly credits class counsel for benefits which the settlement does not create, benefits that BP would have voluntarily issued to class members of its own accord under the GCCF program. The parties present no evidence supporting the idea BP would have terminated its pre-existing

---

[15] Moreover, Klonoff and BP both acknowledge that the actual figure could be significantly lower than $7.8 billion. Annual Report at 163, Klonoff Report ¶ 97. The guaranteed expenditures are well below Klonoff's "conservative estimate" of $5 billion.

remedial program in the absence of this settlement. On the contrary, the fact that payments were made to class members during the pendency of approval strongly suggests that the GCCF relief program would have continued just as before. Moreover, the parties make no attempt to calculate the marginal benefits which supposedly enhanced claim formulas (Plaintiffs Motion for Final Approval at 48-49) bestow upon the class. The value of the settlement is not the $7.8 billion that BP is spending, but the amount that the class will receive *that they would not have already received through the Feinberg GCCF had class action settlement negotiations fallen through*. That number is nowhere near $7.8 billion; the parties present no evidence that it is even greater than zero. While the value of punitive damages claims are certainly in dispute, there are certainly not entirely worthless.

As discussed above, sizable portions of this settlement are nearly-identical to the GCCF program, equating to "relief that duplicates a remedy that most [plaintiffs] already have received, and that remains available to all members of the putative class." *Aqua Dots,* 654 F.3d at 752. "A representative who proposes that high transaction costs (notice and attorneys' fees) be incurred at the class members' expense to obtain a refund that already is on offer is not adequately protecting the class members' interests." *Id.*

*Prudential* is particularly instructive. 148 F.3d at 336-37. It is inappropriate to base a "fee calculation on 'the entire value of the settlement'," including those portions which the settling parties did not produce for the class. *Id.* To be eligible for fees, class counsel must be a "material factor" in the creation of benefits; that is, it had to have been "more than an initial impetus behind the creation of the benefit." *Id. Accord* American Law Institute, *Principles of the Law of Aggregate Litigation* § 3.13 Illustration 2 (2010). Otherwise, "[a]llowing private counsel to

receive fees based on the benefits created by public agencies would undermine the equitable principles which underline the concept of the common fund, and would create an incentive for plaintiffs attorneys to minimize the costs of failure…by freeriding on the monitoring efforts of others." *Prudential*, 148 F.3d at 336-37. *See also In re Cendant Corp. Prides Litig.*, 243 F.3d 722, 741 (3d Cir. 2001) ("[Defendant's] liability and consequent collectability had been conceded at the outset of the PRIDES controversy, and that fact should have been given major consideration by the District Court when setting Kirby's attorneys' fees.").

Here, it is blatantly apparent that class counsel and the proposed settlement are not the causal impetuses for a majority of the dollars that class members are likely to receive. *See Nguyen v. BMW of N. Am. LLC*, 2012 U.S. Dist. LEXIS 56018 (N.D. Cal. Apr. 20, 2012) (class counsel cannot take credit for voluntary remedial efforts of the defendant); *see also Staton v. Boeing Co.*, 327 F.3d 938, 961 (9th Cir. 2003) (expressing concern about "the incorporation in the agreement of promotion and complaint programs Boeing had already developed and implemented, with no obligation on the part of the Company to continue those programs in their present form or alternatively to substitute programs of the same efficacy.").[16] The court should

---

[16] *Cf. also Buckhannon Bd. & Care Home v. W. Va. Dep't of Health & Human Res.*, 532 U.S. 598, 605 (2001) ("A defendant's voluntary change in conduct, although perhaps accomplishing what the plaintiff sought to achieve by the lawsuit, lacks the necessary judicial imprimatur on the change. Our precedents thus counsel against holding that the term "prevailing party" authorizes an award of attorney's fees without a corresponding alteration in the legal relationship of the parties."); *Bublitz v. E.I. Dupont De Nemours & Co.*, 224 F. Supp. 2d 1234, 1239 (S.D. Iowa 2002) ("The Court interprets the Supreme Court's recent decision in *Buckhannon Board and Care Home v. West Virginia Dept. of Health and Human Resources,* 532 U.S. 598, 149 L. Ed. 2d 855, 121 S. Ct. 1835 (2001), as abolishing the catalyst theory with respect to the common fund doctrine. It is true that the precise issue addressed by the Court in Buckhannon is whether the term 'prevailing party' includes a party who has prevailed under the catalyst theory. *Id.* at 610. This Court, however, holds that the broader import of that ruling is not limited to the term 'prevailing party.'") (citations omitted).

look to GCCF operation as a comparator, against which the actual benefit of the settlement can be judged. In this vein, the GCCF issued payments of $6.2 billion over a year and a half, with the anticipation that another $13.8 billion would be paid out over the life of the fund. A proper valuation of the benefit conferred by class counsel must accordingly deduct this amount from the payments made from the settlement fund to class members.

Because the parties have not attempted to make such a showing, the Armours are left only to conclude that the $600 million fee would be disproportionate when compared with the marginal gains to class members; indeed, we cannot even conclude that the settlement doesn't make the class as a whole worse off for the benefit of a minority of class members. A disproportionate fee award thus manifested completes *Bluetooth's* triumvirate of cautionary signals of an unfair, lawyer-driven settlement. As such, it is incumbent upon this Court to reject the settlement until it can pass 23(e) muster.

The Court can and should respond by reducing the fees to an amount proportionate to the *difference* between this settlement and what the class would have received under the GCCF. But if the Court were to do so here, the "kicker" will simply shift the remainder back into the pockets of the defendants—even though the defendants were willing to pay this money to settle the case. In effect, class counsel will have left hundreds of millions of dollars on the table in a futile effort to shield their own attorneys' fees from scrutiny. As the Ninth Circuit has said, "there is no apparent reason" for such a reversion to defendants in the presence of a clear sailing clause indicating the defendants' willingness to pay that money to the class instead. *Bluetooth*, 654 F.3d at 949. Such a reversion by itself would demonstrate an unfair breach of fiduciary duty than cannot be countenanced, and is independent reason to reject the settlement.

**B.**    *Dennis v. Kellogg* **Precludes Settlement Approval.**

There is a second independent reason the settlement cannot be considered fair. BP has the right to appeal awards in the class action claims process. Settlement § 6. The awards to the class are therefore entirely indeterminate and subjective, and require additional litigation (demonstrating another independent reason why this class action is not "superior" to the pre-existing *status quo*). Neither class members nor class members can evaluate in advance what or even when they will be paid. This precludes approval as a matter of law. As in *Dennis v. Kellogg*, No. 11-55674 (9th Cir. Jul. 13, 2012), "Class counsel and [BP] ask us for the impossible — a verdict before the trial. They essentially say, 'Just trust us. Uphold the settlement now, and we'll tell you what it is later.' … The settlement provides no assurance" that class members will receive the just compensation that BP had already promised this Court on October 18, 2010. The fill-in-the-blanks approach is not permissible in a Rule 23 opt-out settlement; if the parties wish to have such an amorphous arrangement, it needs to be through a mass-action opt-in as in *In re Vioxx Prods. Liab. Litig.*, 239 F.R.D. 450, 463 (E.D. La. 2006), while leaving parties the opportunity to continue participating in a restored Feinberg GCCF.

**IV.    The Settlement Procedure Violates Rule 23(h).**

Under the plain language of Fed. R. Civ. Proc 23(h), notice of a motion for class counsel attorneys' fees must be "directed to class members in a reasonable manner." Thus, class counsel is required to submit its basis for attorneys' fees well before objections are due so that the class has a full and fair opportunity to address the claims made. *In re Mercury Interactive Corp. Sec. Lit.*, 618 F.3d 988 (9th Cir. 2010). Objections are due today, August 31, but the legal basis and evidence for the fee request has not yet been filed—even as class counsel has already cashed

enormous checks of tens of millions of dollars. This improper procedure makes approval impossible. "The plain text of the rule requires a district court to set the deadline for objections to counsel's fee request on a date after the motion and documents supporting it have been filed." *Mercury Interactive*, 618 F.3d at 993. Class members have been "deprived of an adequate opportunity to object to the motion." *Id.*

    *Mercury Interactive* requires either rejection of the fee request, or a full and fair opportunity to respond to the fee request; it will be reversible error if objectors are not permitted to respond. The improperly awarded $75 million—and any other improperly paid fees—must be returned until a true adversary hearing has occurred.

## V.    The Court Must Ensure Compliance With Rule 23(e)(3)

    Under Fed. R. Civ. Proc. 23(e)(3), the "parties seeking approval [of a settlement] must file a statement identifying any agreement made in connection with the proposal." But though class counsel has thousands of clients, many of whom have individually settled with BP, no such Rule 23(e)(3) statement has been filed identifying these separate agreements; Rule 23(e)(3) is not even mentioned in the briefs. There are three separate reasons why the Court, or better yet a neutral special master it appoints, must scrutinize these agreements *in camera* if not provide them to a committee of objectors for true adversary review. First, the Court has an obligation under the *Reed* factors to ensure that there was not a side-deal providing favorable treatment for Class Counsel's individual clients in exchange for shorting the benefits to class members without attorneys on the Plaintiffs' Steering Committee. The fairness of what the class members are receiving can be directly compared to what class counsel has negotiated for their own portfolio of clients. Second, even if there was no chance of explicit collusion, a good test for whether what

the settlement provides class members is truly fair is to see whether Class Counsel has been willing to accept the terms of the deal for their own clients that they wish to impose on absent class members, or whether attorneys in the Plaintiffs' Steering Committee have individually negotiated more favorable terms over the life of the Feinberg GCCF than what this settlement provides. Third, given the potential conflicts of interest, it is entirely possible that the parties are engaging in additional violations of Rule 23(h): BP could be agreeing to expedite settlements with the PSC relative to non-PSC attorneys for non-class members so that the PSC attorneys could collect fees quicker from their own portfolios of clients, thus funding their ability to wrest the claims process away from the Feinberg GCCF. There might be any number of irregularities, but we will not know until the parties comply with Rule 23(e)(3) and the appropriate level of independent scrutiny is given. The failure to do so would be reversible error.

## CONCLUSION

For the foregoing reasons, the class cannot be certified, and the settlement cannot be approved.

Dated:  August 31, 2012                    Respectfully submitted,

                              By:        /s/ Christopher A. Bandas
                                    Christopher A. Bandas
                                    State Bar No. 00787637
                                    Southern Bar No. 17509
                                    BANDAS LAW FIRM, P.C.
                                    500 North Shoreline Blvd., Suite 1020
                                    Corpus Christi, Texas 78401-0353
                                    (361) 698-5200 Telephone
                                    (361) 698-5222 Facsimile

                                    Counsel for Objectors
                                    Hunter Armour and Judith Armour

## PROOF OF SERVICE

I hereby certify that on the 31st day of August 2012 a true and correct copy of the above and foregoing was served on the following as indicated below as well as all counsel of record via the Court's CM/ECF system.

Via U.S. Mail & CM-RRR
James Parkerson Roy
Attn: Deepwater Horizon E&PD Settlement
Domengeaux Wright Roy & Edwards
555 Jefferson St., Ste. 500
P.O. Box 3668
Lafayette, LA 70501
Economic & Property Damages Lead Class
Counsel

Via U.S. Mail & CM-RRR
Richard C. Godfrey, P.C.
Attn: Deepwater Horizon E&PD Settlement
Kirkland & Ellis LLP
300 North LaSalle Street
Chicago, IL 60654
Defendants' Counsel

Via CM-ECF Filing
Clerk of Court
United States District Court for the
Eastern District of Louisiana
500 Poydras Street
New Orleans, LA 70130

Executed on August 31, 2012.

/s/ Christopher A. Bandas
Christopher A. Bandas
Tx. State Bar No. 00787637
Tx. Southern Bar No. 17509
BANDAS LAW FIRM, P.C.
500 North Shoreline Blvd., Suite 1020
Corpus Christi, Texas 78401-0353
(361) 698-5200 Telephone
(361) 698-5222 Facsimile