UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

IN RE: OIL SPILL BY THE OIL RIG
"DEEPWATER HORIZON" IN THE
GULF OF MEXICO ON APRIL 20, 2010

This Document Relates to: 2:12-cv-01483
2:12-cv-01484
SD FL 4:12-cv-10070 and
Unfiled Economic and Property Damages
Class Members

(To be filed in: CV-2010-7777)
MDL No.: 2179
Section "J"

Judge Barbier

Magistrate Judge Shushan

## OBJECTIONS AND MEMORANDUM IN SUPPORT OF MRI, LLC AND DAUPHIN ISLAND PROPERTY OWNERS ASSOCIATION'S OBJECTIONS TO PROPOSED SETTLEMENT AGREEMENT

NOW INTO COURT comes MRI, LLC (sometimes hereafter MRI) and DAUPHIN ISLAND PROPERTY OWNERS ASSOCIATION (sometimes hereafter DIPOA), on behalf of themselves and pursuant to various Court orders and specifically Pretrial Order 49[1] file these Objections and Memorandum in support thereof. These objections are supported by a sworn declaration of DIOPA, by and through a member of its board of directors Joseph J. "Jay" Minus, and associated attachments laying out the specifics of the parcels of coastal real property wetlands, is attached hereto and incorporated by reference herein as Exhibit A and a sworn declaration of Objector Reed, and associated attachments laying out the specifics of the parcels of coastal real property wetlands, is attached hereto and incorporated by reference herein as Exhibit B, and the declaration of Geoff Hazard, incorporated by reference here in as Exhibit C.

---

[1] Every reasonable attempt by the undersigned counsel of record has been made to comply with the Court's orders in filing this objection. The filing is objected to, to the extent it requires disclosure of private/confidential information as to Objectors. We note that there was no like requirement placed on Class Representatives and that filings under the Court Supervised Claims Process (hereafter "CSCP") are protected by a variety of confidentiality provisions. See for example Section 4.4.1 and Section 22 of the Settlement Agreement and Pre-Trial Orders 13, 50, 29, 38 and 47.

On or about August 30, 2012 the record in this case was substantially supplemented with myriad declarations of various plaintiff and expert witnesses in support of the proponents' recent legal briefs seeking final approval of the PSA.

This purported evidence was: (1) unopposed by class counsel; (2) not made available at the preliminary approval state/proceedings in April, 2012; (3) has not been subjected to cross examination; () may or may not require and/or meet the so-called Daubert standard; and, (5) comes so late as to deprive these objectors of a meaningful opportunity to properly access and/or challenge the same. Therefore, to the extent the court relies on the same, these objectors object and respectfully reserve the right to conduct discovery including rebuttal testimony.

As we demonstrate below the preliminary approved proposed settlement agreement (sometimes hereafter PSA) is not fair, reasonable nor adequate under the well settled law of the Fifth Circuit Court of Appeals and the Supreme Court of the United States. *See generally, Wal-Mart Stores, Inc. v. Dukes,* 564 U.S. ___, 131 S. Ct. 2541, No. 10-277, slip op. 8 (2011); *Amchem Products, Inc. v. Windsor,* 521 U.S. 591, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997); *Reed v. Gen Motors Corp,* 703 F.2d 170, 172 (5th Cir. 1983); and, *Erica P. John Fund, Inc. v. Halliburton Co., et al.,* 563 U.S.___ (2011).

## INTRODUCTION

The PSA arises out of the worst environmental disasters in the history of the United States causing untold damages to the citizens, business and environment of the Gulf Coast States. In its wake, it has left failed families, failed business, emotional loss and incalculable fear of the real, present and future dangers of living in an environmental zone which many have described as a laboratory where the consequences continue to devolve.

The following undisputed facts set the stage for why the PSA cannot be approved:

1. There is little doubt that BP would be, and ultimately will be, found liable for civil damages incurred by the plaintiffs and class members as a result of the *Deepwater Horizon* oil spill. Indeed, they have already been deemed, and accepted the designation, as a "Responsible Party" under the Oil Pollution Act, 33 USC § 2704(a)(3) (sometimes hereinafter OPA). *See,* In Re Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, 2:20-md-02179 (Doc. 559). Additionally, BP "consistently has said it would pay all legitimate claims." *Id.* And has waived the statutory limitation under OPA. *Id.* Moreover, "BP [is] liable for civil penalties under Section 311(b)(7) of the CWA, 33 USC § 1321(b)(7), because [it is the owner] of the offshore facility from which oil discharged." (Doc. 5809).

2. On February 26, 2011, on the eve of trial which would have determined, among other things, the degree of negligence/culpability of BP (a defendant who is solvent and never made any credible threat of bankruptcy), the then-Plaintiff's Steering Committee, now Class Counsel, announced that substantial portions of the case had been settled. Details were sketchy and it would several months for the Committee to release the details and two more before finally unveiling it to absent class members, their counsel and other members of the public at the hearing for preliminary approval.

3. Overnight, an uncapped claims process (GCCF) with a 20 billion dollar floor, in which hundreds of thousands of claimants from all 50 states participated, transformed into a new Court Supervised Claims Program (sometimes CSCP) which by BP's contemporaneous public announcements reduced its exposure to between 7-8 billion dollars providing limited coverage to claimants in only five states.

4. After the PSA, a 75 million dollar advance of fees and expenses to Class Counsel was made, and if the PSA is approved, would make 600 million dollars available to the class counsel.

5. The PSA is objectionable, because, among other things, it impermissibly establishes intraclass conflicts, especially but without limitation to coastal wetland class members/real property zones; the nine class representatives (the vast majority residing in Economic Zone A which has no causation requirement and higher RTPs) and especially the single class representative for the coastal wetland/real property zones do not adequately and fairly represent the absent class members; the PSA is unfair and unreasonable with respect to the arbitrary and capricious establish of the economic settlement zones; and, the PSA is unfair and unreasonable with respect to the amount of fees paid to Class Counsel who may themselves not be adequate depending upon further discovery as to their acts and/or omissions in furtherance of the best interests of all putative members of the class.[2]

## ARGUMENT

The PSA is talismanic and specious and should not be approved.

Class counsel has failed to meet its burden of establishing that the PSA should be approved. The putative class fails F.R.C.P.'s strictures because the class representatives are not "adequate", common issues do not "predominate" (F.R.C.P. 23(b)(3)). And, as has traditionally been the case with mass tort disasters, the class action mechanism is not "superior" to other methods for adjudicating the controversy. As an initial matter, there is substantial intra-class conflict between the class representatives and the unnamed class members.

---

[2] At the time these objections were filed, objectors were aware of myriad like or similar objections. To the extent those objections are not inconsistent with these objections they are respectfully adopted herein and incorporated by reference.

### A. THE CONDITIONALLY CERTIFIED CLASS FAILS THE ADEQUACY OF REPRESENTATION REQUIREMENT.

Adequacy of representation has been recognized as the most important single factor in determining whether to certify a settlement class. *See In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*, 148 F.3d 283, 308 (3d Cir. 1998) ("Indeed, the key to *Amchem* appears to be the careful inquiry into adequacy of representatives.") In order to satisfy Rule 23's requirements for adequate representation, the court must find that class representatives, their counsel, and the relationship between the two are adequate to protect the interests of absent class members." *Unger v. Amedisys Inc.*, 401 F.3d 316, 321 (5th Cir. 2005). "[T]he Rule 23 adequacy inquiry also uncovers conflicts of interest between the named plaintiffs and the class they seek to represent." *Langbecker*, 476 F.3d at 314 (internal quotation marks omitted); *accord Amchem*, 521 U.S. at 625, 117 S.Ct. 2231. "[I]ntraclass conflicts may negate adequacy under Rule 23(a)(4)." *Langbecker*, 476 F.3d at 315.

#### 1) The Interests of the Named Plaintiffs Are Not Sufficiently Aligned With Those of the Objectors or Similarly Situated Wet Lands Real Property Owners

There is dissimilarity and conflict rife between the claims and interests of the named class representatives and the unnamed members they would seek to represent. For example, the PSA purports to provide relief to class members who own wetlands real property.[3] Section 5.8, *et seq.* of the PSA define the Wetlands Real Property Damage Compensation scheme by reference to Exhibits 12A – 12D.[4] In turn, Exhibit 12A (1) (B) provides Wetlands Real Property Claim Zone shall be defined as the blue shaded portions of the Wetlands Real Property Compensation Zone Map attached as Appendix A. (See Appendix B for a description of the criteria used to establish

---

[3] *See generally*, In Re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010, United States District Court for the Eastern District of Louisiana, 2:10-md-02179-CJB-SS (Doc. 6430).
[4] *Id.* at 33 – 34.

the "Wetlands Real Property Claim Zone").[5] The Zone Map referenced as Appendix A extends east from the Texas/Louisiana border to the Mississippi/Louisiana border as the Zone's terminus.

However, the area of compensation depicted in the Zone Map can be extended under certain circumstances:

> E. A parcel not located within the Wetlands Real Property Claim Zone may be added to the Wetlands Real Property Claim Zone by the Claims Administrator only if the parcel is documented as containing the presence of oil pursuant to SCAT or an official assessment conducted by the Natural Resource Trustees in connection with the DWH Spill. Only parcels located in the following geographic area ("Area of Potential Eligibility") are eligible to provide such documentation:
>
> > i. As far west as the Louisiana/Texas state line
> > ii. As far east as the Louisiana/Mississippi state line
> > iii. As far south as the end of Louisiana state waters
> > iv. As far north as one half mile inland from the Wetlands Real Property Claim Zone (refer to Appendix D for the "Area of Potential Eligibility Map").[6]

Additionally, the Zones are further reduced to those areas which are within the so-called SCAT line: "For the purposes of calculating the Wetlands Real Property Compensation Amount, the Claims Administrator will use the SCAT Zones defined by the Maximum Oiling Observed file published on the Environmental Resource Management Application (ERMA) Gulf Response website."[7] The SCAT Zone, "has a boundary defined by the condition of oil observed during a survey by SCAT assessment teams…"[8]

In sum, it is clear that the maximum geographical area where a plaintiff might be compensated for damage to wetlands real property is confined *exclusively* within the borders of the state of Louisiana eliminating important protection and relief for similarly situated class members in Alabama, Mississippi, Florida and Texas.

---

[5] *Id.*, Exhibit 12A at 1.
[6] *Id.*, Exhibit 12A at 3.
[7] *Id.*, Exhibit 12A at fn. 1.
[8] *Id.*, Exhibit 12A at 2.

### A. *Conflict Between Louisiana Class Members and Other State Class Members*

The limitation of the zone to the state of Louisiana apparently is without regard to the 72,000 acres of crucial coastal wetlands habitat designated by the Mississippi Department of Marine Resources Coastal Preserves Program which are located within the state of Mississippi.[9] Additionally, the Auburn University Marine Extension & Research Center states, "Alabama has approximately 118,000 acres of coastal wetlands."[10] And those wet lands, "can be divided into 75,000 acres of forested wetlands, 4,400 acres of fresh marsh, 35, 400 acres of non-fresh (salt or estuarine) marsh, and 3,994 acres in the beach/dune complex.[11] Finally, moving eastward, there are over one million acres of coastal wetlands in the state of Florida.[12]

The PSA as written with respect to the wetlands real property damages scheme treats class members from the Louisiana coast so differently from the similarly situated class members who own wetlands in Mississippi, Alabama and Florida as to create an intra-class conflict as to the relief and protections available.

For instance, the National Oceanic and Atmospheric Administration (NOAA) Environmental Response Management Application (ERMA)—which is the vehicle by which the SCAT Zones are produced, mapped and recorded—released their findings of cumulative oiled beaches one year after the spill.[13] On April 6, 2011 NOAA had observed and recorded data on 1080.9 of shoreline in: Hancock, Harrison and Jackson Counties, Mississippi; Mobile and Baldwin Counties, Alabama; and, Escambia, Okaloosa, Walton, Bay, Gulf, Franklin and Wakulla Counties, Florida. The Detailed Breakdown of Maximum Surface Oiling Conditions

---

[9] http://www.dmr.ms.gov/coastal-ecology/coastal-preserves
[10] http://www.masgc.org/pdf/masgp/96-018.pdf
[11] http://www.masgc.org/pdf/masgp/96-018.pdf
[12] http://coastalmanagement.noaa.gov/mystate/docs/fl3092011.pdf, at 6.
[13] http://gomex.erma.noaa.gov/layerfiles/16118/files/MaxOil%20Split%20Tables%20-%20GulfShores_Local_DC.pdf

states that, of those 1080.9 miles of shoreline surveyed, 422.4 miles had at least some oil observed. Thirty-nine percent of the coast of Mississippi, Alabama and the Florida panhandle were oiled in the year after the spill. Yet the PSA does not even contemplate the owners of wetlands real property for these 1080.9 miles of shoreline or any other area outside the state of Louisiana.

## I.     Dauphin Island Property Owners Association

DIOPA owns and claims littoral interests in dozens of miles of Gulf Coast shoreline and submerged lands on a barrier island off of the southern coast of Alabama. This shoreline was oiled.[14] Despite being less than 50 miles away, over the Gulf of Mexico, from Louisiana's Breton National Wildlife Refuge, the entire shoreline of Dauphin Island is excluded from any compensation for real property wetlands damage. Instead it is relegated to an inadequate compensation schemes in the PSA; namely, the Coastal Real Property Settlement.

The economic remedy between the conflicting class plaintiffs cannot be over stated. DIOPA owns approximately two hundred (200) acres more-or-less of real property as well as claims to littoral submerged lands on Dauphin Island, Alabama. A large amount of the acreage is unimproved marshland and wetlands located directly on the Gulf of Mexico. These lands have importance for water quality, flood control, shoreline protection, and recreation. They serve as nurseries for numerous species, waterfowl, and a host of resident and migratory species. They also have cultural and ecological significance to the residents and visitors of Dauphin Island.

DIOPA is an Alabama Non-Profit Corporation. Its mission is to promote the development and betterment of Mobile County, Alabama, and in particular, Dauphin Island and Little Dauphin Island, Alabama in the public interest and apply its net assets to that end without

---

[14] *See generally*, the ERMA Gulf Response website at http://gomex.erma.noaa.gov/. To access the file, select "SCAT" and then select "Maximum Oiling Observed."

pecuniary profit to the incorporators or members of the Association. Among DIPOA's powers is to receive and hold, as owner, all of the real property acquired from and deeded to the Association from the Mobile County Chamber of Commerce, shown on that certain map titled "1953 Subdivision of Dauphin Island, Ala.", attached hereto and incorporated by reference herein as Exhibit C.

DIPOA's property, including but not limited to, Parcel Numbers R025301000012060, R025201000024006.001, R025201000024006, R025201000025013, R025201000026053, R025201000026051, R025201000027017, experienced devastating effects from the Oil Spill. Oil, tar balls, and clean-up dispersant chemicals from the Oil Spill repeatedly washed into the wetland property, significantly injuring the area. The properties also suffered diminution in property value, as a direct result of the oil spill.

Unreasonably, these properties are not included within the Wetlands Real Property zone of the PSA despite oiling and being within a designated Mobile SCAT grid cell. This disqualifies DIPOA for any compensation under the valuable Wetlands Real Property settlement provision for the clear caused by the *Deepwater Horizon* Oil Spill.

Accordingly, DIPOA objects to the PSA as it treats similarly situated wetlands owners in Louisiana so disparately from them and DIOPA so as to create an intraclass conflict between them.

Significantly, the same disparate treatment exists for every class member that owns real property wetlands within the class definitions of the 422.4 miles of coast line in Mississippi, Alabama and the panhandle of Florida.

      a.    **A Faustian Election**

In addition to the disadvantages described above, DIPOA is disadvantaged by PSA in its inflexibility and inconsistency with OPA. *See generally* 33 U.S.C.A. §§ 2701 to 2762. In addition to being a property loss claimant, DIPOA is also an economic loss class member entitled to damages arising out of its loss of income from, among other things, rental commercial space and concessions from club operations (which include such line items as food, beverage and golf course fees and the like).

Because the PSA does not allow for filing of a partial claim DIPOA is forced to make a Faustian election and forego filing its economic loss claim (a liquidated loss which it desperately needs to survive) until there is an answer to the instant objection so as not to claim split, which the PSA forbids and OPA allows. Of note, this false election may well prejudice, and will complicate, its opt-out rights (notwithstanding the Court's extension). This dilemma presents a real hardship, intended or not, that didn't exist in the GCCF or OPA which both allow for partial/interim claims. To penalize DIPOA by starving it out while it waits or is forced to opt-out because it cannot know whether or not it will receive just and fair compensation for its coastal wetlands loss is not fair, nor is it reasonable. This choice, in effect, penalizes them for being in the class.

The remedy provided by the PSA is not adequate and clearly the remedy here is not superior. If DIPOA elected to receive the remedies under the Coast Real Property Settlement they would be losing millions of dollars in compensation which would be due and owed to a similarly situated Louisiana wetland property owner with 200 acres of qualified land. This is because the Coast Real Property Settlement basis compensation on a percentage of a claimant's

2010 property tax assessors value as reduced by a fixed formula, whereas the Coast Wetlands scheme multiplies the numbers of acres by a much larger number located on a sliding scale.[15]

### b. Declaration of Prof. Geoff Hazard

Attached hereto and incorporated by reference herein as Exhibit D is the declaration of Prof. Geoff Hazard. As he makes clear, the PSA must fail for a variety of reasons. Chief among them is the intraclass conflict made the principal basis of the instant objections. The declarations speaks for itself and in all respects is adopted herein.

### II. MRI, LLC

Objector Reed, and the company of which is he is a member and holder of 22.43% of the outstanding membership interest, MRI, LLC are also, upon reasonably information and belief, class members. MRI, LLC owns approximately two-hundred fifty (250) acres of real property on Ft. Morgan peninsula near the city of Gulf Shores, Alabama. This real property is unimproved marshland and wetland located directly on St. Andrews Bay.

The MRI, LLC parcels on Ft. Morgan have been designated wetlands by NOAA. They are also a US Fish and Wildlife Service National Wildlife Refuge Place of Interest as well as part of the US Fish and Wildlife Coastal Barrier Resource Center.

The *Deepwater Horizon* Incident damaged MRI's property when oil, tar balls, and clean-up and dispersant chemicals from the Oil Spill repeatedly washed into the wetland property. The resulting long-term damage to MRI's property has significantly devastated the ecology and environmental profile of the wetland property, and has also reduced the value of the property.

Despite the obvious oiling, and that MRI, LLC's property on Ft. Morgan is within a designated Mobile SCAT Grid Cells, the property is none the less also not within the Wetlands

---

[15] The declaration of Marc Vellrath, Ph.D., CFA (Case 2:10-cv-07777-CJB-SS) (Doc. 91-2 at ¶ 205) discusses how even if property owners on Dauphin Island were to take even a lucrative Real Property Settlement, they would still be under compensated because of the unique nature of the island.

Real Property zone according the PSA. Like DIPOA, this disqualifies MRI for compensation for their clear losses directly resulting from the *Deepwater Horizon* Oil Spill.

Accordingly, Objector Reed, by and through his interest in MRI, LLC, and DIOPA objects to the PSA as it treats similarly situated wetlands owners in Louisiana so disparately from them and MRI, LLC as to create a conflict between them.

Attached hereto and incorporated by reference herein as Exhibit E is a list of the objectors' names, phone numbers, and addresses.

### B.  *Inadequate Class Representative*

In order to proceed as a class action, "a class representative must be part of the class and possess the same interest and suffer the same injury as the class members." *Wal-Mart Stores, Inc. v. Dukes,* 564 U.S. ___, 131 S. Ct. 2541, No. 10-277, slip op. 8 (2011) (internal quotation and citation omitted). Among other criteria, a class action cannot be certified unless the court determines that the class representatives "will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). The purpose of Rule 23(a)(4) is to assure that the absent class members' interests are represented in the litigation so as to make it fair to bind them to the release and settlement of the action. *Amchem,* 521 U.S. at 621. The court must determine that the putative named plaintiff has the ability and the incentive to represent the claims of the class vigorously, and that there is no conflict between the individual's claims and those asserted on behalf of the class. This inquiry is vital, as class members with divergent or conflicting interests from the named plaintiffs and class counsel cannot be adequately represented. *Community Bank II,* 622 F.3d at 291 (internal quotation marks and citation omitted).

Although the Class Action Complaint for Private Economic Losses and Property Damages in the above referenced cause does not specifically tie the named class representatives

with an individual category of damages, it does set out fifteen named class representatives. One of them is almost certainly the designated class representative for wetlands damages: "Representative Plaintiff Lake Eugenie Land & Development, Inc. ("Lake Eugenie Land") is a Louisiana corporation with its principal place of business in Metairie, Louisiana. Lake Eugenie Land owns 50,000 acres of marshland in St. Bernard Parish, Louisiana." (Doc. 1, at 12). The Complaint goes on to state that "Lake Eugenie Land suffered, and continues to suffer, wetland property damage due to the Deepwater Horizon Incident." *Id.*

The damages alleged are obvious: "The Deepwater Horizon Incident damaged Lake Eugenie Land's property when oil, tar balls, and clean-up and dispersant chemicals from the Oil Spill repeatedly washed into the wetland property. The resulting long-term damage to Lake Eugenie Land's property has significantly devastated the ecology and environmental profile of the wetland property, and has also reduced the value of the property." *Id.*

It is inconceivable to suggest that when oil, tar balls, and clean-up and dispersant chemicals from the Oil Spill repeatedly washed into the wetland property located in Mississippi, Alabama and the panhandle of Florida that those wetlands were not also subjected to equal to, if not greater, devastation of the ecology and environmental profile of those wetlands properties while also reducing their value.

A comparison of the geographic zone maps which delineate the boundaries of the wetlands real property settlement zone and the map of St. Bernard Parish, Louisiana, unsurprisingly yields great overlap. As demonstrated above any wetlands the entire 422.4 miles coast line of Mississippi, Alabama and the panhandle of Florida are excluded, by the geographic limitations of the current PSA, from eligibility. Accordingly, it is a legal and logical

impossibility that a Louisiana wetlands real property owner could fairly and adequately represent the interests of putative class members who reside anywhere but the state of Louisiana.

This inadequacy of class representation is yet another example of the intraclass conflicts created by the PSA in the above referenced cause. Just exactly how Lake Eugenie Land is adequate is not answered by Class Counsel or Bp. We are left to wonder: is Lake Eugenie Land in fact a class member?; does Lake Eugenie Land have knowledge as to wetlands and similarly situated properties in areas not included? Bp and class counsel have provided no evidence of this.

### C.   *Clear precedent requires overturning the conditional certification of this putative class based upon these intra-class conflicts.*

Based upon clear precedent, case law requires that the PSA be stricken for its failure and inability to rectify fundamental intra-class conflicts between the class members. The zone of compensation for real property wet lands extends only to the reaches of the Louisiana border. This creates an intraclass conflict with the owners of real property wetlands in other areas directly affected by the spill who had their wetlands oiled.

The nature of the problem here is akin to those which required decertification or denial of various settlements in *Amchem Products, Inc. v. Windsor*, and its progeny. *See Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997); *Dewey v. Volkswagen Aktiengesellschaft*, 681 F.3d 170, 182 (3d Cir. 2012). By compensating Louisiana real property wetlands owners and not those similarly situated owners in other states, the PSA essentially creates a favored class of claimants who have already suffered injury. The disfavored class, under the terms of the PSA, are akin to "future" claimants, i.e., those whose rights have not yet ripened under the terms of the agreement because they are not entitled to compensation. *See Amchem*, 521 U.S. at 611, 117 S.Ct. 2231 ("Already injured parties ... would care little about

[benefits that may be important to future claimants] and would rationally trade them for higher current payouts.")

Like the *Amchem* settlement, the benefits here vary significantly such that some class members will receive millions of dollars in compensation, while others will receive nothing. Like the Amchem settlement, the PSA here "does more than simply provide a general recovery fund[,] [r]ather, it makes important judgments on how recovery is to be allocated among different kinds of plaintiffs, decisions that necessarily favor some claimants over others." *Georgine v. Amchem Prods., Inc.*, 83 F.3d 610, 630 (3d Cir. 1996). Like the PSA here, the Amchem settlement papered over a conflict between two types of claimants whose incentives and interests diverged from one another under the terms of the Settlement such that one group "would care little about" the interests of the other "and would rationally trade them for higher current payouts." *Id.* at 611, 117 S.Ct. 2231. Here, the class members in Louisiana care nothing for the interests of the class members who own oiled real property wet lands in other states. Like the named plaintiffs in Amchem, once designated as being within the currently defined compensation zone, "that class member would be solely concerned with obtaining a 'generous immediate payment[ ]' for the injury, not securing" a fair, realistic, favorable formula for establishing causation or even a fair and meaningful set of parameters for the Economic Loss Zones. *See Dewey*, 681 F.3d at 185, *citing Amchem*, 521 U.S. at 626, 117 S.Ct. 2231.

This conflict is also similar to the one that felled the settlement in *Dewey*. In *Dewey*, the Third Circuit found that where the proposed settlement divided class members into a reimbursement group and a residual group, but all representative plaintiffs were in the reimbursement group, the lead plaintiffs "cannot adequately represent class members" in the other group. *Dewey*, 681 F.3d at 187. The Court in *Dewey* explained that "[t]he structure of the

settlement agreement itself, which divides a single class into two groups of plaintiffs that receive different benefits, supports the inference that the representative plaintiffs are inadequate." *Id.* The Plaintiffs had undertaken a "line-drawing exercise" whereby they categorized certain class members as within the "reimbursement" group which had priority access to the Settlement funds, and other class members as within the "residual" group which only had access after the reimbursement group. *Id.* According to the Court, each Plaintiff had an incentive to maximize the number of plaintiffs in the residual group while drawing the dividing line at a point to include themselves within the reimbursement group. Here too, each Plaintiff here too had an incentive to see itself placed in the zone of compensation as currently defined while seeing other Claimants designated outside the zone of compensation.[16] Just as with the *Dewey* Plaintiffs, the representative plaintiffs and their counsel "could not adequately represent the entire class in determining where the line would lie, because the settlement provided 'no structural assurance' that the class representatives . . . [all of whom were in one group] – could adequately represent the interests of the class members" in the other group. *Id.* 189.

There can be no doubt that as constituted this poses a significant conflict of interest between the named parties – none of whom are located within zone of compensation as currently drawn—and the class they seek to represent. *Id.* at 625, 117 S.Ct. 2231. *See Richard A. Nagareda, Administering Adequacy in Class Representation, 82 Tex. L. Rev. 287, 290 (2003)* ("Dutifully following ... the text of Rule 23(a)(4), current law focuses largely on aligning the

---

[16] Although Dewey was a "limited fund" case, in light of the numbers of claimants and the extent of losses, that is a distinction without a difference. The number of claimants and extent of injuries could eclipse BP's economic resources. Moreover, monies are paid on a first-come, first-serve basis, such that there has been a veritable "race to the courthouse" for purposes of submitting claims. In light of the magnitude of injury, the continuing threat of punitive damages from Claimants who have already opted-out and are pursuing litigation, as well as the vast numbers of parties, for example in Texas and Florida, who have strong, legitimate claims that are simply left out of this Settlement, there is no such thing as an 'unlimited fund' with respect to this case. Even if BP's Assets are sufficient to cover the claims, "this does not permit representative plaintiffs to bypass structural requirements." *Dewey*, 681 F.3d at 189 n.19 (noting that the Supreme Court in *Amchem* rejected a similar argument).

'interests' of the persons within the class. The idea is that the 'representative parties' will 'fairly and adequately protect' those interests and, in so doing, legitimately bind absent class members to the resulting judgment.") Moreover, this conflict could not be more "fundamental", in that it pertains to the threshold question of whether or not a class member may recover. *See Dewey*, 681 F.3d at 184 ("A conflict concerning the allocation of remedies amongst class members with competing interests can be fundamental and can thus render a representative plaintiff inadequate."), *citing Ortiz*, 527 U.S. at 857, 119 S.Ct. 2295; and *citing Amchem*, 521 U.S. at 626–27, 117 S.Ct. 2231. Class members who need not show causation demonstrably have no interest in policing the procedures or requirements of proof for those who are required to show causation. As a result, the class representatives as constituted are inadequate to represent absent class members outside the zone of compensation as currently drawn– the overwhelming majority of class members. *See Amchem,* 521 U.S. at 625–26, 117 S.Ct. 2231 (A class representative must "possess the same interest and suffer the same injury as the class members.") (internal quotation marks omitted).

### D. *Recent Re-Oiling of Gulf Coast Beaches Require Further Objection*

At the time these objections were made, Hurricane Issac churned up Gulf Waters and various media was reporting significant reoiling of coastal property , which calls into question the efficacy, timeliness, and adequacy of any settlement at this time. Given the three year statute of limitations under OPA and maritime claims the PSA is not exigent. Should carbon finger printing establish a match to MC252 oil then the compensation and damage scheme central to the PSA, especially the RTPs, is inadequate.

If these reports turn out to be true and MC252 oil is found, then the compensations and damages scheme central to the entire PSA, especially the RTPs are inadequate. Accordingly

these objectors object to the adequacy of the PSA subject to further discovery and development of evidence.

## CONCLUSION

As these objectors have demonstrated, the intraclass conflicts alone warrant denial of final approval of the current PSA. Unfortunately, class counsel has failed to meet, and cannot on this record, comply with the strictures under *Reed* or any applicable case law for final approval. The Court should either Grant these objections or deny the PSA.

Respectfully submitted,

s/Frederick T. Kuykendall, III
AL Bar No. ASB4462A59F
Federal Bar No.: KUYF4462
KUYKENDALL & ASSOCIATES, LLC
2012 1st Avenue North, Suite 450
Birmingham, AL 35203
Phone: (205) 453-0060
Fax: (205) 453-0042
Plaintiffs' Counsel

s/Grant D. Amey
AL Bar No. ASB4273T83A
Federal Bar No.: AMEYG4273
KUYKENDALL & ASSOCIATES, LLC
2012 1st Avenue North, Suite 450
Birmingham, AL 35203
Phone: 9205) 453-0060
Fax: (205) 453-0042
Plaintiffs' Counsel

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that the above and foregoing Statement of Objections has been served on All Counsel by electronically uploading the same to LexisNexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the

Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, in accordance with Pretrial Order No. 49 established in MDL 2179, on this 6th day of September 2012.

I HEREBY FURTHER CERTIFY that the above and foregoing Statement of Objections was sent by U.S. first-class mail to: **Economic Lead Class Counsel:** James Parkerson Roy, Esquire, Attention: Deepwater Horizon E&PD Settlement, Domegeaux Wright Roy & Edwards, 556 Jefferson Street, Suite 500, Post Office Box 3668, Lafayette, LA 70501; Stephen J. Herman, Esquire, Attention: Deepwater Horizon E&PB Settlement, Herman Herman Katz & Cotlar LLP, 820 O'Keefe Avenue, New Orleans, LA 70113; **Defendants' Counsel:** Richard C. Godfrey, P.C., Attention: Deepwater Horizon E&PD Settlement, Kirkland & Ellis LLP, 300 North LaSalle Street, Chicago, IL 60654, on this 6th day of September, 2012.

s/Frederick T. Kuykendall, III
AL Bar No. ASB4462A59F
Federal Bar No.: KUYF4462
KUYKENDALL & ASSOCIATES, LLC
2012 1st Avenue North, Suite 450
Birmingham, AL 35203
Phone: (205) 453-0060
Fax: (205) 453-0042
Plaintiffs' Counsel